IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS A. PAYNE,

        Plaintiff,

      v.                                Civil Action No. 1:05-CV-165

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

      Plaintiff, Thomas A. Payne, (Claimant), filed his Complaint on December 22, 2005,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on April 26,

2006.[2]   Claimant filed his Motion for Summary Judgment on June 6, 2006.[3]  Commissioner filed

her Motion for Summary Judgment on July 3, 2006.[4]

B.    <u>The Pleadings</u>

          1.      <u>Claimant's Motion for Summary Judgment</u>.

          2.      <u>Commissioner's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 12.

[4] Docket No. 13.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so she may consider Dr. Simmons' opinion in accord with the first remand order entered in this case and may give additional consideration to the what the record reveals regarding the severity of Claimant's post-traumatic stress disorder.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

 Claimant filed his application for Disability Insurance Benefits on April 7, 2000, alleging disability since April 9, 1999.  The claim was denied initially and on reconsideration.  Claimant requested a hearing before an ALJ, and received such a hearing on June 21, 2001.  On September 26, 2001, the ALJ issued a decision adverse to Claimant.  Claimant requested review before the Appeals Council, but it denied the request.  Claimant filed an appeal before this Court in March 2002.  The Honorably Irene Keeley, U.S. District Judge, issued an order remanding the case to Commissioner based on July 18, 2003.  The case was assigned to a different ALJ upon remand.  Claimant filed a second application for benefits on August 14, 2002, again alleging disability from April 9, 1999.  This application was also denied initially and on reconsideration.  Claimant requested review by an ALJ.  Claimant received a hearing before an ALJ on February 24, 2004.  An ALJ considered Claimant's two applications together and issued an adverse decision in May 17, 2004.  Claimant requested review by the Appeals Council.  Claimant then filed a third

application for benefits on June 20, 2004. This application resulted in an award of benefits. The

Appeals Council issued a partially favorable decision to Claimant, finding him disabled as of May

1, 2004. Claimant timely filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 52 years old on the date of the June 21, 2001 hearing before the ALJ. He

was 54 years old on the date of the February 24, 2004 hearing. Claimant has a high school

equivalent education. Claimant has prior relevant work experience as a maintenance worker,

welder, auto restorer, carpenter, and customer service representative.

C.    Medical History

The following medical history is relevant to the time period during which Commissioner

concluded that Claimant was not under a disability: April 9, 1999 – May 1, 2004.[5]

**Psychiatric Review Technique, 5/26/00, Tr. 104**
Organic mental disorders: no evidence
Schizophrenic, paranoid and other psychotic disorders: no evidence
Affective disorders: no evidence
Mental retardation and autism: no evidence

Anxiety related disorders: anxiety as the predominant disturbance or anxiety experienced in the
attempt to master symptoms, as evidenced by the following: PTSD

Somatoform disorders: no evidence
Personality disorders: no evidence
Substance addiction disorders: absent

Functional limitation
        Restriction of activities of daily living: slight
        Difficulties in maintaining social functioning: moderate
        Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in

---

[5] Even though the ALJ's decision was dated May 17, 2004, Commissioner has granted
disability as of May 1, 2004. Thus, this is the relevant date up to which the Court must consider
Claimant's alleged disability.

a timely manner: seldom

       Episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms: never

## Mental Residual Functional Capacity Assessment, 5/26/00, Tr. 113

Understanding and memory

       The ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions: no evidence

       The ability to understand and remember detailed instructions: not significantly limited

Sustained concentration and persistence

       The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods: not significantly limited

       The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

       The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions: no evidence of limitation

Social interaction

       The ability to interact appropriately with the general public: not significantly limited

       The ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: moderately limited

Adaptation

       The ability to set realistic goals or make plans independently of others: not significantly limited

       The ability to respond appropriately to changes in the work setting: moderately limited

       The ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation: no evidence of limitation

## Physical Residual Functional Capacity Assessment, 5/30/00, Tr. 117

Exertional limitations

       Occasionally lift and/or carry: 20 pounds

       Frequently lift and/or carry: 10 pounds

       Stand and/or walk for a total of about 6 hours in an 8 hour work day

       Sit for a total of about 6 hours in an 8 hour work day

       Push and/or pull: unlimited

Postural limitations
> Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations
> Reaching in all directions: limited
> Handling, fingering, feeling: unlimited

Visual limitations: none established
Communicative limitations: none established

Environmental limitations
> Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited
> Extreme heat, extreme cold, hazards: avoid concentrated exposure

**Dung S. Le, D.P.M., 6/19/00, Tr. 126**
Diagnoses: non-insulin dependent diabetes mellitus, blocked sweat ducts that are asymptomatic and do not need treated

**Joseph Snead, M.D., 4/22/99, Tr. 157**
Diagnosis: chronic lumbosacral strain

**Joseph Snead, M.D., 10/21/99, Tr. 172**
Impression: The ankle mortise is intact. Metallic orthopedic plate with screws is seen transfixing distal fibula. No abnormal lucencies around the screw areas are noted. Some spurring involving distal tibia is seen. There is a moderately large posterior and small inferior calcaneal spur.

**Joseph Snead, M.D., 10/21/99, Tr. 173**
Impression: there is some reversal of cervical lordotic curvature which may be due to muscle spasm. There is narrowing of the disc space at the level of C5-6 with degenerative hypertrophic spur formation. There is a suggestion of slight encroachment upon the neural formation at this level. The height of vertebral bodies is maintained. Odontoid process is maintained.

**Joseph Snead, M.D., 10/21/99, Tr. 174**
Impression: alight, height of vertebral bodies, disc spaces, and pedicles are maintained. There is a moderate degree of degenerative hypertrophic spur formation at multiple levels. There is degenerative hypertrophic spur formation of moderate degree of the visual lumbar spine.

**Joseph Snead, M.D., 8/19/99, Tr. 176**
Impression: There is some reversal of the cervical lordotic curvature which may be due to muscle spasm. There is hypertrophic spurring anteriorly C5 and C6 vertebral bodies with intervertebral disc narrowing between C5-6. There may be slight osteophytic encroachment in the intervertebral foramen at the level between C5-6 on the right side.

**Joseph Snead, M.D., 4/22/99, Tr. 186**
Impression: Alignment and height of vertebral bodies and disc spaces are maintained. There is a mild to moderate degree of degenerative hypertrophic spur formation at the level of L1-2 and L5 is seen. There is mild sclerosis of the aorta.

**Psychiatric Review Technique, 10/20/00, Tr. 187**
The patient has anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by the following: recurrent and intrusive recollections of traumatic experience, which are a source of marked distress

Functional limitation
      Restriction of activities of daily living, difficulties in maintaining concentration, persistence, or pace: mild
      Difficulties in maintaining social functioning: moderate
      Repeated episodes of decompensation, each of extended duration: none

**Physical Residual Functional Capacity Assessment, 9/18/02, Tr. 432**
Exertional limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Sidney B. Jackson, M.D., 5/27/03, Tr. 442**
Assessment: The patient has significant cervical, lumbar, and thoracic degenerative joint disease, arthritis, and degenerative disc disease with spinal stenosis and neural foraminal stenosis.

**Sidney B. Jackson, M.D., 5/28/03, Tr. 444**
Impression: degenerative disc disease at C3-4 and 5-6 with secondary degenerative osteoarthritic changes, slight loss of height within the anterior portion of the body of C3.

**John A. Lucci, M.D., 4/2/02, Tr. 456**
Assessment: chronic cervical pain, secondary to probable degenerative joint disease, chronic low back pain, secondary to probable degenerative joint disease

**Mohammed Omar, M.D., 6/25/01, Tr. 495**
Impression: diverticulosis of the entire colon, elongated appendix

**Medical Source Statement of Ability to Do Work-Related Activities, 12/9/03, Tr. 496**
Exertional limitations
    Are lifting and carrying affected by the impairment?  Yes.
        Occasionally lift and/or carry 10 pounds
        Frequently lift and/or carry (nothing checked)
    Are standing and/or waling affected by the impairment?  No.
    Is sitting affected by the impairment?  No.
    Is pushing and/or pulling affected by the impairment?  Yes.
        (Nothing checked regarding limitations)

Postural limitations
    Balancing, kneeling: frequently
    Climbing, crawling: occasionally
    Crouching, stooping: never

Manipulative limitations
    Reaching in all directions, handling, fingering, feeling: unlimited

Visual/communicative limitations
    Seeing, hearing, speaking: unlimited

Environmental limitations
    Vibration, hazards: limited
    Temperature extremes, noise, dust, humidity, fumes, odors, chemicals, gases: unlimited

**Dung S. Le, D.P.M., 1/13/04, Tr. 509**
Diagnosis: non-insulin dependent diabetes mellitus without pedal manifestation

**Dung S. Le, D.P.M., 1/13/04, Tr. 510**
Diagnosis: non-insulin dependent diabetes mellitus without pedal manifestation

**John Lucci, M.D., 12/3/03, Tr. 512**
Assessment: chronic cervical pain secondary to spinal stenosis, chronic low back pain

**John Lucci, M.D., 8/11/03, Tr. 513**
Assessment: chronic cervical pain, secondary to spinal stenosis, chronic low back pain

**Radhakrishna Murthy, M.D., 1/14/04, Tr. 521**
Diagnosis: benign prostatic hypertrophy with no significant obstructive symptoms

**Thomas Moore, P.A.-S, 12/4/03, Tr. 524**
Impression: degenerative disc disease at C3-4 and 5-6 with secondary degenerative osteoarthritic changes, slight loss of height within the anterior portion of the body of C3.

**Herbert Johnson, M.D., 5/26/03, Tr. 532**
Impression: degenerative disc disease at C3-4 and 5-6 with secondary degenerative osteoarthritic changes, slight loss of height within the anterior portion of the body of C3.

**Herbert Johnson, M.D., 5/27/03, Tr. 533**
Impression: early degenerative osteoarthritic changes in the lumbar spine showing no significant progression since the examination of 4/22/99, early atheromatous changes involving the abdominal aorta.

**Martin Levin, M.A., 3/22/04, Tr. 538**
WAIS III
> Verbal IQ: 77
> Performance IQ: 86
> Full scale IQ: 79
> Verbal comprehension: 86
> Perceptual organization: 86
> Working memory: 78

The test results are considered invalid.

WRAT III
> Reading: 70, 4th grade
> Spelling: 71, 5th grade
> Arithmetic: 79, 6th grade

The WRAT III scores are not considered valid.

Diagnosis:
Axis I: posttraumatic stress disorder, alcohol abuse, in early sustained remission
Axis III: degenerative arthritis of the cervical spine and upper thoracic spine, right arm pain, stiffness in neck, diabetes, high blood pressure, all as reported by Claimant

Prognosis: guarded

**Medical Source Statement of Ability to Do Work-Related Activities, 3/24/04, Tr. 544**
Is the ability to understand, remember, and carry out instructions affected by the impairment: No.
> Understand and remember short, simple instructions, carry out short, simple instructions, the ability to make judgments on simple work related decisions: no impairment
> Understand and remember detailed instructions, carry out detailed instructions: slight impairment

Is the ability to respond appropriately to supervision, co-workers and work pressures in a work setting affected by the impairment? Yes.
> Interact appropriately with the public, interact appropriately with supervisors, interact

appropriately with co-workers, respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting: moderate impairment

D.    Testimonial Evidence

Testimony was taken at the June 21, 2001 hearing before an ALJ.  The following portions of testimony are relevant to the disposition of this case.

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q     Okay.  Currently, what area of your back or cervical area bothers you?

A     Right now it bothers me between my shoulder blades, around my neck, and above my belt line in the lower lumbar area.

Q     Okay.

A     I have back pain.

Q     Now does that pain ever radiate into any other areas, or does it stay localized?

A     Well, it goes up and down my back, but between my shoulder blades and down below around my belt line.

Q     Okay.  Do you ever experience any symptoms in your legs, arms, or fingers?

A     Every now and then I'll get cramps in my legs sometimes, and my right arm it gets numbness.  My two middle fingers, they get numb sometimes.  And then sometimes I'll pass water without knowing it.

Q     Okay.  How often does that happen?

A     So far since I've had my back problems, it's only happened twice.

Q     Okay.  All right.  What about the pain that radiates into your legs, and like you said into your fingers, about how often does that happen?

A     Maybe about twice, three times a month.

Q      Do you constantly suffer from some degree of pain, or does it come and go?

A      No, I have pain every day.

Q      On a scale of 1 to 10, being mild pain, and 10 being severe pain, what would you rate your pain at it's worst?

A      It's be about a 10.

Q      And what about your pain at it's best?

A      Well, it'd be about a five.

Q      Okay.  How often would you say your pain reaches a level 10?

A      Well, probably about three or four times a week.  Sometimes three or four times a day.  It all depends on if I'm sitting long or if I stand up and sit too long, I'll get pain in the lower, lower part of my back above the belt line.

Q      Okay.  When your pain's that severe, what do you generally do to try to relieve your pain?

A      I either lay down, I take Flexeril.

Q      Okay.  About how long do you have to lay down before you start experiencing some relief?

A      I usually lay down probably about two to three hours.  If I take a Flexeril, it puts me to sleep, so about three hours or so.

Q      Okay.  Do you do anything else to relieve pain other than lying down?

A      Well, I usually walk sometimes, do a little exercise, if I can they told me to try to exercise, keep my stomach muscles built up because that will help relieve some of the pain in my

back.

Q       Okay.  You're also in therapy?

A       Yes, ma'am.

Q       How often do you go to therapy?

A       I go to therapy Tuesdays and Thursday every week.

Q       Are you experiencing any relief from the therapy?

A       Very little.  It's not going to - - they a pain's always going to be there, unless I have surgery.

*                 *                 *

Q       About how far can you walk before you start noticing an increase in pain?

A       Well, I try to walk every day, probably about a half a block, maybe not that far then I stop.

Q       Okay.  About how long can you stand?

A       Oh, probably about 20 minutes to a half hour or so.

Q       Okay.

A       Then I start getting  pain in the lower part of my back, and then in my hips.

Q       Okay.  About how long can you sit?

A       Sometimes probably about a half hour or so.  I sit there - - it all depends on what kind of chair I'm sitting in.

Q       All right.  And how much can you lift currently?

A       Well, I haven't lifted anything over probably about 12 pounds, in that area, because he said not to lift anything.

Q     What doctor told you that?

A     That was the examiner, Dr. Sneed.

Q     Okay.  Do you have difficulty bending?

A     Yes, ma'am, I do.  When I bend I got to take my time, if I don't I get like a pain to shoot up my back between my shoulder blades, like it's hitting me right in the back of my head.

Q     Okay.  What about any reaching type of an action?

A     When I reach sometimes it hurts between my shoulder blades too when I reach for something.

Q     Okay.  Can you do any stooping or crouching?

A     I can, but very slowly.

Q     Okay.  What about a pushing and pulling type of an action?

A     Well, I don't try to do too much if it's going to aggravate.

Q     Okay.  I noticed today that you do have a cane with you.

A     Yes, ma'am.  I do.  When I bend I got to take my time, if I don't I get like a pain to shoot up my back between my shoulder blades, like it's hitting me right in the back of my head.

Q     Okay.  What about any reaching type of an action?

A     When I reach sometimes it hurts between my shoulder blades too when I reach for something.

Q     Okay.  Can you do any stooping or crouching?

A     I can, but very slowly.

Q     Okay.  What about a pushing and pulling type of an action?

A     Well, I don't try to do too much if it's going to aggravate.

Q      Okay.  I noticed today that you do have a cane with you.

A      Yes, ma'am.

Q      Is that cane prescribed?

A      They gave me the cane to relieve the pressure and then plus on my ankle, I have a set of screws in my ankle where I had broken my ankle in '93.

Q      Okay.

A      So they gave this to relieve the pressure.  Also in my ankle and my back.

Q      Okay.  How long have you been using the cane?

A      I had the cane probably about two years.

Q      Okay.  Do you ever use any other assistive devices other than the cane like crutches or a walker?

A      Sometimes I use my crutches.

Q      Okay.  What causes you to use your crutches rather than you use your cane?

A      Well, it could be bad weather, stress.  I get stressed out, get irritated.  If I sit here too long, I just get up and use my crutches, because I can't hardly move and twist.

Q      Okay.  Do things like stress and weather make your pain become worse?

A      Sometimes it does.

Q      Okay.  All right.  About how often are you using the crutches?

A      Oh, probably - - it varies, sometimes it might be once a month, maybe two times a month, sometimes, you know it just varies.

                    *              *              *

Q      Okay.  Now let's go over your daily activities, your household chores, and how

your back condition interferes with that.  For example, do you do any cooking or cleaning around the house?

A     Yes, ma'am, I do.  I do it all mostly, because I when my wife when she comes in, I have it ready for her.

Q     Okay.  You're talking about the cooking?

A     Well, the cooking, I start probably around - - well, she gets off around three o'clock.  I usually start around about 11 o'clock, get everything going, and have it ready by the time she gets home.

Q     What are you cooking?

A     Huh?

Q     What are you cooking?

A     What do I cook?  It all depends.  I cook a nice meal, nice size meal.

Q     Okay.  All right.  Do you do any lawn work?

A     I do my lawn, yes, ma'am.

Q     Okay.  Do you have - - how big is your lawn?

A     It's not too big.  It's not as big as this room.

Q     Okay.  Is it a push mower?

A     It's a push mower.

Q     Okay.  What about like laundry, grocery shopping?

A     She does the laundry, she does the grocery shopping.  Sometimes I go with her.

Q     Okay.  Do you ever notice that pain interferes with your ability to concentrate or with your memory?

A       Sometime I do.

Q       Okay.  Can you give me some examples?

A       Well, it's like I had some forms and stuff I had to fill out, and then I couldn't hardly think because my back started hurting me, so I had to take a break and just relax a little bit.

Q       Okay.  Does pain affect your moods at all?

A       Sometimes I get very irritable at the least little thing sometimes, you know.  It could be anything, and I'll get very irritable, get all upset.  And sometimes I don't see how she can put up with me sometime, but I do get very irritable sometimes.

*                    *                    *

Q       Now because of the combination of your problems, has it prevented you from doing things that you use to do, certain hobbies or - -

A       Well, I don't fish as much as I use to.  I do swim like I use to.  There's a lot of things I used to like to do - - I like - - I use to like to jog two miles a day, which I don't do that any more.  I use to like to lift weight, I use to be a weight lifter.  I don't do that any more.  So I don't get to do really everything I use to do.

Q       Are there any hobbies you're still able to maintain despite these problems?

A       I do very - - like a garage that I do a little bit of woodwork in.

Q       Okay.  And how often do you get out there and to do that?

A       Well, I stay busy to try to keep my mind focused.  I'm in my garage every day.

Q       Okay.  Has it affected your social life at all?

A       Well, I don't go anywhere any more, because I can't stand the pain to go out.  (INAUDIBLE) all the time, I don't go over, because I have to sit.  So I don't do too much.  I just

15

stay around the house in the garage.

Q      Okay.  Do you belong to any clubs or organizations?

A      American Legion, VFW, and (INAUDIBLE) State Lodge which is the Elks.

Q      Okay.  Do you attend their meetings on a regular basis?

A      No ma'am.  I haven't been to a meeting probably about two years.

Q      Okay.  What about church?

A      I haven't been to church regular like I use to go.  I use to go every Sunday, so probably about once a month.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      All right.  Then would you describe the claimant's past work in terms of skill and exertional levels?

A      Yes, Your Honor.  The most recent job with the casket company, the maintenance man, would be classified as heavy, semiskilled work.  Prior to that, the job with the VA would be heavy, unskilled.  The customer service job with the mattress company would be heavy semiskilled.  The rough carpenter job is classified by the DOT as heavy semiskilled.  And the truck driver would be medium semiskilled.  The restoration worker, the car, the auto restorer would be medium semiskilled also.

Q      Transferable skills?

A      No, Your Honor.

Q      All right.  Okay.  Then let me ask you to assume a hypothetical individual of the claimant's age, educational background, and work history.  Assume that a person is able to

16

perform medium work.  Would be able to perform all postural movements occasionally.  Should work in a low stress environment.  Should have no more than occasional interaction with others.  And should not be exposed to temperature extremes.  Would there be any work in the regional or national economy that such a person could perform?

A       Yes, Your Honor.  There would be jobs within those limitations indicated in the hypothetical at the medium level.  Some examples would be that of a vehicle washer or equipment cleaner.  There are 270 in the local labor market, 140,000 nation.  There are janitors, 4,800 local, 1,500,000 nation.  There are hand packers, 155 local, 118,000 nation.  And there are laundry workers, 90 local, 50,000 nation.  These would be some examples of low stress work at the medium level of exertion.

Q       All right.  Then let me ask you to reduce the exertional level to light, add a sit/stand option, and retain the other limitations.  Would there be anything that would accommodate that?

A       With those additional limitations at the light level, Your Honor, there would be.  There are laundry folders, 125 local, 68,000 nation.   There are mailroom clerks other than United States Postal Service, 160 local, 152,000 nation.  There are inspector/checkers of small products, 500 local, 111,000 nation.  There are labelers and marker, shipping departments, 215 local, 64,000 nation.  These would be some examples of simple routine low stress work at the light level with the sit/stand option.

*               *               *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       I would like to add to that.  If a person was taking medication for both physical and

17

psychological problems that cause drowsiness, they needed to lay down on occasion throughout the day due to pain, and also a person's memory and concentration skills would be limited due to pain, and the combination of all of those symptoms would cause a person to be off task one-third of the work day.

A       If this were the case, this would preclude the individual from any competitive employment at any exertional level including the jobs given.   You would have to be able to function independently, be on task for at least 90% of the work day, and not require frequent breaks.  He couldn't lay down over and above the work breaks.  So to answer your questions, that would preclude the individual from all the jobs offered.

*               *               *

Testimony was also taken at the February 24, 2004 hearing before an ALJ.  The following portions of testimony from that hearing are also relevant.

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       Okay.  Now, how long can you sit before some problem of yours keeps you from sitting any longer?

A       Probably about a half-hour sometimes.

Q       Okay.  And what would be the thing that would prevent you from sitting longer than that?  Would it be back pain, leg pain?

A       Well, usually if I sit too long, like I said, it'd be right at the catch of my back here and if my legs are out when I'm sitting on the couch, you can feel it, like, it's going down through sometimes.  And I would get up or walk over to the door or get in the recliner or lay on the floor.

Q       Okay.

A       Now, lately here I've been laying on the floor.  And that helps sometimes.

Q       How long would you have to do that either lay on the floor or walk around before you could go back to sitting?

A       Oh, most of the time I just usually just stayed on the floor sometimes.  And then sometimes, I forgot, I used to take a shower, a hot shower.

Q       Okay.

A       And that relieves it sometimes.

Q       Okay.

A       As hot as I can stand it.

Q       Are you sleeping on the floor now?

A       I've been sleeping on the floor, on the floor here, about three weeks.  And I haven't  slept with my wife probably - - in the bed with her because of my disturbing her sleep and everything.  It's been about two years.

                              *              *              *

A       Like, I try to cut the grass sometime, and it bothers me.  I don't even cut the grass. I have my nephews come up and do it.

Q       How big is your yard?

A       Well, the yard I have now since we moved in September I got a bigger yard, and it's a nice size yard.  You got to use a riding mower in the back.

Q       Okay.  How - - okay.  Let's go back to standing.

A       Okay.

Q       Just standing without walking - -

A  Okay.

Q  How long can you stand without leaning on something?

A  Probably about 20 minutes.

Q  Okay.  And what causes you to have to stop standing at that point?

A  Because it's - - if I stand too long it's like I'm getting a catch in my back, like it's starting to hurt.  So, I lean against a wall or I'll sit down.

Q  And how long do you have to do those before you go back to standing?

A  Probably about 20 minutes I was leaning against - - or sometimes I'll crouch down and get against a wall.  Sometimes that helps get up.

Q  Can you walk a city block without stopping?

A  Sometimes, sometimes I can't.  I've been trying to walk, because the VA told me I need to walk for exercise and everything.  So, I try to walk.  And I try to, you know, do what I can.

Q  When you have difficulty walking a block what is it that stops you?

A  Well, when I start walking I start getting like - - my ankles sometimes will start, and then I'll get a catch in my back or sometimes around my shoulders.  So, then I'll just sit back or lean against a wall or sit down on something for a little bit.

Q  And when your ankle is bothering you how long of a break do you have to take before you can continue walking?

A  Oh, if it starts I'll usually take a break on my ankle, and I try to walk.  If it 's my ankle, I'll at least usually sit there about ten or 15 minutes, and I'll just massage my ankle, just work it.

*              *              *

Q        What time do you go to bed?

A        Well, yesterday - - I usually go to bed probably around about 8:30, 9:00,

sometimes 10:00.  Then I'm up probably about 1:00.  Then I watch TV until I may doze off then

I'm back up probably around about 3:00.  I just go - - it goes off and on.

Q        And when you wake up at 3:00 are you up for the day?

A        Well, when I wake up around 3:00 I either try to watch TV.  Now, I'll watch TV

probably about as long as I can, and I might end up dozing off.  The alarm goes off to wake my

wife up to go to work.  Then I'm up.  I'm up for the rest of the day.

Q        Okay.  What wakes you up at 1:00?

A        Just wake up.

                    *              *              *

Q        Okay, good.  Do you have days when you wake up in the morning, and you don't

see any interest in getting dressed or showering?

A        I have a lot of days like that.

Q        How often in a week will that happen?

A        I'm usually - - well, sometimes I don't feel like getting dressed.  Now, we're down

to one car now.  So, normally, I'll say probably one or two days a week maybe three days a week

sometimes.  I just lay there and just don't do anything.

Q        On those days do you get up and get dressed?

A        Maybe later on that afternoon.

Q        Do you shower on those days?

A       Yes, I do.

                          *              *              *

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Okay.  Do you have any hobbies you engage in?

A       Well, I like to, but I have - - I like to fish and hunt but - -

Q       Did you do any of those last year or this winter?

A       No, sir.

Q       Do you read?

A       I try to read sometime.  I try to read everyday.

Q       What are you reading currently?  Anything specific?

A       I read sports magazine but mostly I read my Bible.

Q       How about church attendance?

A       I go to church.

Q       How many times a week?

A       Well, since I had - - well, I used to be in church all the time.  Since November,

I've been there - - try to make it every Sunday.

Q       Have you been on any trips?

A       No, sir.

Q       Out of town?  Do you lie down during the day because of your back and neck

pain?

A       Yes, sir.  I do lie down sometimes.

Q       How much yesterday?

                                      22

A    Yesterday - - my wife and I.  Yes, we did.  Yes, I did.  I laid down around about I think it was about 2:00.  I didn't get up until around about 4:00 or something.

Q    Okay.  And is that usually the case?

A    I mean, I just - - my back's hurting I sleep on the floor.  That's what I usually do.

*          *          *

Q    Okay.  Do you cook during the day?

A    No, sir.

Q    How about clean - -

A    No, sir.

Q    - - the house?  What did you say about the yard, Mr. Payne?  Do you cut the yard?

A    I said I used to cut the yard at the old place, because it was small, but it would take me awhile.  But the yard I have now takes a riding mower - -

Q    Okay.

A     - - for the back and everything.  I just don't do that or my wife she'd go out and try to do it or she'd get her nephew or my nephew to come up to do it.

Q    But you don't get on the riding lawnmower yourself?

A    No, sir.  It's not running anyway.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q    Would you please describe Mr. Payne's work?

A    Yes, Your Honor.  The most recent job, the maintenance position with the casket company, would be classified as heavy, skilled work.  Prior to that the maintenance with the VA

medical center would also be heavy, skilled work.  The truck driver and rough carpenter

positions, the truck driving would be medium to heavy, semiskilled.  Rough carpentry is heavy,

skilled.  The customer service position with the mattress company would be heavy, semiskilled.

And the maintenance position, the groundskeeper with the VA, would be medium, semiskilled.

And the restoration of automobiles, classic automobiles, would be medium to heavy, skilled

work, Your Honor.

Q        Please assume an individual approaching advance age of 54 precluded from

performing - - with a equivalent of a high school education, precluded from performing all but

light work with a sit/stand option, no hazards, no climbing, occasional posturals, no temperature

extremes, that's unskilled and low stress defined as one- and two-step processes, routine and

repetitive tasks.  With those limitations, could you describe any work this hypothetical individual

can perform?

A        With those limitations at the light level, Your Honor, I could offer the following

jobs.  There are laundry folders, 300 local, 48,000 nation.  There are hand packers, 600 local,

200,000 nation.  There are inspector checkers of small products, 800 local, 111,000 nation.  And

there are sorters and graders, 200 local, 49,000 nation.  These are all at the light level, Your

Honor.

Q        Those jobs you named, Mr. Mohler, do they entail exposure to vibration?

A        No, Your Honor.

Q        What is the, although light classified, jobs do they entail - - do any of those jobs

entail lifting less than ten pounds?

A        The inspector checker would - - I would put that about ten pounds, Your Honor;

and the laundry folder also about ten pounds.

Q      And they're in the DOT as light for what reason?

A      Because you're on your feet usually more than five or six hours but typically employers have gone to putting what they call a sit/stand lean stool where the person can stay at the position, reduces back strain and leg strain.  So, that option usually exists in these types of jobs.  The DOT is fairly old in that respect, Your Honor.

Q      Okay.  Speaking of which are those jobs consistent with the DOT?

A      They are with the exception of the sit/stand option not being described in the definitions.  And the reason I do offer these jobs in response to your hypothetical is based on my experience in placing disabled workers in jobs for 25 years.  And these types of jobs do allow the worker to sit and stand while doing essential duties.

Q      There is a statement by Dr. Jackson in Exhibit 11F, the Claimant's treating physician at VA, stating - - it regards the issue of pushing and reaching.  Do these jobs entail, let's see, he said the Claimant this could exacerbate - - do they entail repetitive overhead reaching?

A      No, these jobs are working at your waist level, Your Honor.  There's no overhead reaching for the most part.  And certainly not repetitive.

Q      Second hypothetical, sir.  The - - Mr. Payne testified he'd lie down generally 2:00 to 4:00 p.m. daily.  If the workday is 8:00 to 4:30, are those jobs impacted?

A      Yes, if this was the case, Your Honor, this individual could not sustain these jobs. You couldn't lay down at anytime on the job at these kind of jobs.  There's two 15 minute breaks, a half-hour for lunch.

Q       Mr. Payne testified that he's had some anger in the past.  He's currently on valproic acid.  What is, if his general mental condition impacted on his ability to concentrate, where he could not stay on task one-third to two-thirds of the day, are those jobs affected?

A       Yes, Your Honor.  To sustain these types of jobs, unskilled work, you have to be on task and functioning at least 85 to 90 percent of the day.  So, that would preclude him from sustaining these jobs also.

ALJ            Okay.  Okay, Mr. Miskowic.

ATTY           Thank you, Your Honor.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       With respect to the Judge's last two hypotheticals lying down for two hours a day and being off task for one-third to two-thirds of the day, I assume that would preclude all other jobs in the national economy also?

A       Yes, it would.

Q       If we added to the Judge's first hypothetical that the individual was limited in reaching in all directions not just overhead, would that affect his ability to perform any of the jobs you identified?

A       Yes.  These jobs all require fairly frequent reaching for small objects to inspect and where to fold and where to pack them.  So, yes, that would, if he couldn't reach pretty much respectively in front of himself, he couldn't do these jobs.

Q       Okay.  How would  that impact his ability to perform jobs in the national economy beyond the jobs you identified with the light exertional?

A       Well, there are jobs that don't require repetitive reaching or handling.  There jobs

26

such as ushers, desk attendants, hostesses - - things like that where you could be sitting or standing, but you wouldn't really be using your hands very much in a repetitive nature.

Q      Would those jobs respond to the Judge's first hypothetical except for the reaching?

A      No, these jobs all deal primarily with people.

Q      Okay.

A      So, that would not really comply with his hypothetical for things.

Q      So, if I added a limitation of reaching in all direction, it would precluded jobs at the light level I think is what you're testifying to.  With the Judge's other limitations.

A      With all the other limitations, yes.

Q      Okay.  Now, you've indicated that you've been a vocational counselor for 25 years and in your practice you've placed people with mental limitations in jobs.

A      Yes.

Q      Okay.  Have you dealt with clients who have mental limitations, but you've concluded that the impact from those limitations is so minimal you really didn't have to factor it into the placement decision?

A      Sure.

Q      Okay.  At what point, when you're placing someone who has limitations such as ability when working in a schedule, work with coworkers, maintaining temper, would you say it's beyond minimal?

A      When the anger or mental impairment gets to the point where the person can't behave in an emotionally stable manner, has outburst, or basically couldn't concentrate or function independently within a schedule more than - - if it affects them where you can't do at

least 85 to 90 percent workday, if it's happening on a regular basis, say ten to 15 percent of workday, then that would be a problem.

Q        That would be something you'd have to factor into the placement decision?

A        Right.  If he couldn't adhere to a schedule and act and behave in an emotionally stable manner and just stay on task for at least 85 to 90 percent of the workday then he couldn't do competitive work.  He might be able to do some supportive work but not competitive.

Q        Okay.  I just want to make sure that I understand what you're saying.  What I'm asking you is not so much would it preclude the work but would it be something you would have to take into account if you decided not to place this person?

A        Oh, sure.   It would depend on how severe it was as to whether I would have him working around or having interaction with other people.  It would depend on the types of jobs and the type of work environment, some type of task I would try to place him in.

Q        Okay.  So, if we take the Judge's first hypothetical - -

A        Okay.

Q        - - but I add to this, first of all, I'm going to ask you about certain moderate limitations, and I define moderate as more than minimal, which you've indicated is an inability to do this activity 85 to 90 percent of the time.  So, that you have to factor it into your placement decision.

A        Okay.

Q        That's the definition of moderate.

A        Okay.

Q        And the activities are the ability to perform the activities within schedule, maintain

regular attendance and be punctual within customary tolerances, the ability to work in coordination with or in proximity to others without being distracted by them, the ability to complete a normal workday and workweek without interruptions due to psychologically-based symptoms, the ability to accept instructions and respond appropriately to criticism and supervisors, ability to get along with coworkers or peers without being distracted by them or distracting them, the ability to maintain socially appropriate behavior and appear to basic standards of neatness and cleanliness, and the ability to respond appropriately to changes in the work setting.  If those are moderate, and moderate is defined as more than minimal as you just described it, if I had that to the Judge's first hypothetical, could you identify jobs in the national economy?

A        Not within competitive employment.  These jobs all assume the ability to function independently more than minimally.  You have to be able to be on task and not have problems with people.  You have to be able to be punctual.  You can't be late all the time.  If you're late, you'll get written up after the first or second time.  If it continues to be a problem, you'll be let go in unskilled work.

*          *          *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Cooks for himself and his wife (Tr. 245)

• Used a push mower to cut grass during some of the relevant period (Tr. 245-46, 579)

- Plays with his cat and dog (Tr. 542)

- Goes to the Elk's Club and the American Legion (Tr. 543)

- Suffered from alcohol abuse during some of the period in question (Tr. 543, 571)

- Smoked cigarettes during some of the period in question (Tr. 571)

- Enjoys fishing and hunting (Tr. 577)

- Reads everyday (Tr. 577)

- Regularly attends church (Tr. 578)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the decisions of the ALJ and Appeals Council are not supported by substantial evidence.  Specifically, Claimant argues the ALJ and Appeals Council failed to give adequate consideration to the opinion of Dr. Simmons, as directed by the Court in its previous remand order.  Claimant argues that if Commissioner had properly considered Dr. Simmmons' opinion, she would have been compelled to find him disabled.  Claimant further argues the ALJ ignored testimony of the Vocational Expert (VE) showing that when Claimant's mental limitations were considered, Claimant could not maintain competitive employment.

Commissioner argues the decisions of the ALJ and Appeals Council have substantial evidence to support them.  Commissioner contends the ALJ correctly evaluated Dr. Simmons' opinion and correctly considered Claimant's mental impairments.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden. In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3)

whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

I.

<u>Commissioner's Consideration of Dr. Simmons' Opinion</u>

Claimant first contends the ALJ and Appeals Council erred in not properly considering the opinion of Dr. Simmons, as the Court in its previous decision instructed Commissioner to do. Claimant argues Dr. Simmons found Claimant suffered from limitations in his ability to reach in all directions. Claimant then states that when the VE was asked if Claimant could perform any jobs if he could not reach in all directions, the VE responded in the negative. Yet the ALJ found Claimant capable of performing work. Claimant contends this was error. Commissioner contends the ALJ properly considered Dr. Simmons' opinion, along with all the other medical evidence in the record, to determine Claimant capable of performing light work.

The Court begins by considering the previous remand. Magistrate Judge Kaull found that

> the ALJ failed to address Dr. Simmons' finding that Plaintiff was limited in "reaching in all directions (including overhead)." This is despite the fact that Plaintiff testified that cervical pain around his neck and between his shoulder blades was the main reason he felt incapable of working, and despite the fact that objective medical evidence showed Plaintiff had been treated extensively for cervical degenerative arthritis since a service-related accident in 1988.

(Tr. 310) (citations omitted). The district court adopted Magistrate Judge Kaull's

33

recommendation in total. (Tr. 331). Magistrate Judge Kaull clearly directed Commissioner on remand to consider the opinion of Dr. Simmons. (Tr. 310). He did not direct Commissioner to adopt Dr. Simmons' opinion. Id. The question here is whether Commissioner complied with the remand order.

The ALJ's opinion indicated he "adopt[ed]" Dr. Simmons' opinion that Claimant should be limited to light work. (Tr. 272). He noted Dr. Simmons "specifically considered the abnormal findings of the claimant's cervical spine." Id. The Appeals Council later concurred in this conclusion, finding that "the claimant is capable of doing no more than a light level of exertion." (Tr. 595). Based on the finding that Claimant is capable of light work, the ALJ found Claimant was capable of doing other work and so was not disabled. (Tr. 274).

Although the ALJ did not explicitly consider "Dr. Simmons' finding that Plaintiff was limited in 'reaching in all directions (including overhead),'" as directed by Magistrate Judge Kaull, the Court is not quick to find error since the ALJ stated he agreed with Dr. Simmons' finding that Claimant is limited to light work. (Tr. 272, 310). After all, if the ALJ stated he was adopting Dr. Simmons' opinion in total, it would be unnecessary for him to consider all the details of the opinion. The mere statement would be sufficient. The Court would also not find error if the ALJ did not adequately consider Dr. Simmons' opinion, but otherwise made clear he agreed with its substance. While the failure to consider the opinion itself would be legal error, it would not be reversible error. Sullivan v. Hudson, 490 U.S. 877, 886 (1989) (finding that failure to follow remand instructions is legal error); Morgan v. Barnhart, 142 Fed. Appx. 716, 723 (4th Cir. 2005) (quoting Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) for the notion that reversal is not required where the error does not affect the substance of the case). Since the

34

ALJ did not explicitly consider Dr. Simmons' limitations concerning reaching and did not otherwise indicate he agreed with the Dr. Simmons' entire opinion, the Court believes the ALJ committed legal error.  Hudson, 490 U.S. at 886.  The Court must therefore examine the contents of Dr. Simmons' opinions and the how they relate to the ALJ's opinion to determine if the ALJ should be reversed.

Dr. Simmons completed a physical residual functional capacity assessment regarding Claimant in May 2000.  (Tr. 117-124).  As part of that assessment, Dr. Simmons checked a box indicating Claimant was "limited" regarding his ability for "reaching in all directions (including overhead)."  (Tr. 120).  Dr. Simmons wrote in the margins that Claimant had "stiffness of neck which would limit cervical ROM."  Id.

At the hearing before the ALJ in February 2004, Claimant's attorney asked the VE whether Claimant could perform any jobs if he were limited in his ability to reach in all directions.  (Tr. 585).  The VE responded that if a person had limitations in reaching in addition to the first hypothetical asked by the ALJ, he could not perform any work.  (Tr. 586).  The first hypothetical from the ALJ did not include any limitations not ultimately included in the residual functional capacity the ALJ assigned to Claimant.  (Tr. 270-71, 583).  Therefore, the VE's testimony was that assuming the limitations assessed by Dr. Simmons are correct, Claimant cannot perform any work and must be found disabled.  20 C.F.R. § 404.1520(a)(4)(v) (stating that if a person cannot perform any work, "we will find that you are disabled").

Since adoption of Dr. Simmons' opinion regarding Claimant's limitations regarding reaching would have meant finding Claimant incapable of performing any work, it is clear the ALJ did not agree with the substance of Dr. Simmons' opinion and therefore committed

reversible error. Magistrate Judge Kaull clearly instructed the ALJ to consider Dr. Simmons'

opinion regarding Claimant's limitations in his ability to reach. (Tr. 310). The ALJ failed to do

this. Since the ALJ did not adopt Dr. Simmons' in total and did not agree with the substance of it,

his opinion must be reversed. Hudson, 490 U.S. at 886 (finding that failure to follow remand

instructions is legal error); Morgan v. Barnhart, 142 Fed. Appx. at 723 (quoting Ngarurih, 371

F.3d at 190 n. 8 for the notion that reversal is not required where the error does not affect the

substance of the case).

On remand, the ALJ should explicitly consider the limitations Dr. Simmons assessed

regarding Claimant's reaching ability. The Court wishes to emphasize that simply because the

ALJ must expressly consider the opinion does not mean he must adopt it. The ALJ should weigh

Dr. Simmons' opinion as appropriate with all the over evidence of record to determine if

Claimant is disabled.

Commissioner expends a significant amount of energy in her brief attempting to show

why the ALJ's position had substantial evidence to support it. It may be that had the ALJ

correctly considered Dr. Simmons' opinion in accord with the previous remand, he would have

reached the same conclusion and that this conclusion would have had substantial evidence to

support it. The Court does not reach that issue. That is not the relevant question. The question

is, rather, whether the ALJ complied with the terms of the Court's previous remand. As detailed

above, the Court finds he did not and the case must therefore be remanded for further

consideration.

The ALJ's Evaluation of Claimant's Post-Traumatic Stress Disorder

Claimant next argues the ALJ improperly considered the effects of his post-traumatic stress disorder. Claimant notes medical sources found him to have moderate limitations in social functioning. Claimant states that while the ALJ correctly found this disorder a severe impairment, he ignored relevant testimony of the VE showing someone with moderate limitations in social functioning and having other limitations of Claimant could not maintain employment. Commissioner maintains the ALJ's decision is supported by substantial evidence.

Claimant is correct that medical sources found moderate limitations in his ability to work around other people. Dr. Levin found moderate limitations in Claimant's ability to behave appropriately with the public, supervisors, and co-workers. (Tr. 545). He also found moderate limitations in Claimant's ability to react to work pressures and changes in the work place. Id. Similarly, Dr. Kuzniar determined Claimant had moderate limitations in his ability to respond to instruction and criticism from supervisors, to interact with co-workers, and to exhibit appropriate social behavior. (Tr. 114).

The ALJ concurred in these physicians' findings that Claimant's mental impairments pose moderate limitations in his ability to function socially. (Tr. 267). This occurred at step three of the sequential evaluation process. Id. When the ALJ considered the effect Claimant's mental impairments should have on his residual functional capacity, he limited him to "routine and repetitive work, working primarily with things rather than people." (Tr. 272).

Claimant argues the ALJ mis-understood the severity of his limitations. He points out that the VE defined "minimal" limitations as those affecting a person less than fifteen percent of a

work day. (Tr. 587). Yet Claimant notes doctors have stated he has moderate limitations. Claimant notes that when the VE was asked if someone with the RFC the ALJ assigned to Claimant and who also was unable to be on task for fifteen percent of the work day would have any work available to him, the VE responded in the negative. (Tr. 588-89). Claimant argues the ALJ should have used this testimony to award benefits. In making this argument, Claimant is actually arguing that the limitations from mental impairments assigned by the ALJ in the residual functional capacity were insufficient. Therefore, the Court will evaluate this argument as one assigning error to the portion of the ALJ's residual functional capacity dealing with Claimant's mental impairments.

The residual functional capacity is what Claimant can still do despite his limitations. 20 C.F.R. § 404.1545. It is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps Claimant from performing particular work activities. Id. This assessment is not a decision on whether Claimant is disabled, but is used as a basis for determining the particular types of work she may be able to do despite impairments. Id. The ALJ's decision will be upheld as long as it has substantial evidence to support it. Hays, 907 F.2d at 1456.

The Court believes the ALJ gave insufficient consideration to the evidence of record and therefore the case must be remanded so the ALJ may more thoroughly consider the evidence of

Claimant's post-traumatic stress disorder. While the ALJ agreed Claimant suffered from post-traumatic stress disorder, he also found that "construing all doubt in favor of the claimant . . . the record only reflects the claimant's suffering acute episodes . . . on three occasions." (Tr. 272). The ALJ identified several incidents. (Tr. 140, 151, 161, 272). However, the Court has found other places in the record where Claimant exhibits symptoms at least as severe as some of the episodes mentioned by the ALJ. (Tr. 446, 450, 474, 528-29). Furthermore, some of the records mentioned by the ALJ speak of multiple incidents. In October 1999, for instance, Claimant was noted to have had "several frustrations." (Tr. 151). In March 2000, Claimant reported he had "considerable trust problems and anger surges." (Tr. 140). Although the ALJ refers to each record as a single occasion, some of them in fact show continuing problems. Thus, the Court cannot say that substantial evidence supports the ALJ's finding that Claimant "only" had three acute incidents of post-traumatic stress disorder.

While remand is appropriate on this point, the Court makes no finding regarding the severity of Claimant's post-traumatic stress disorder. The ALJ also found Claimant's disorder responded well to medication. (Tr. 272). The record appears to support this. (Tr. 151). It may ultimately be that the ALJ correctly assessed the limitations Claimant's post-traumatic stress disorder imposes. The Court can simply not make that determination given the evidence ignored and mis-interpreted by the ALJ.

Finally, the Court notes that while Claimant argues the Court should order a grant of benefits, and particularly mentions it has been six years since he initially filed his application, such an order is an extreme remedy that is inappropriate in this case. It is the duty of the ALJ, not the courts, to make factual findings and "resolve conflicts in the evidence." Smith v. Chater, 99

F.3d 635, 638 (4th Cir. 1996). It is true that where the a claimant is clearly entitled to benefits the Court may order such a grant. Alejandro v. Barnhart, 291 F. Supp. 2d 497, 516 (S.D. Tex. 2003); Sullivan v. Halter, 135 F. Supp. 2d 985, 988 (S.D. Iowa 2001); Nalley v. Apfel, 100 F. Supp. 2d 947, 954 (S.D. Iowa 2000). Yet the record is not so unambiguous in this case. The Court sympathizes with Claimant's situation. It is understandable that Claimant finds it frustrating to have to have to appeal to this Court two times and endure what will now be a third administrating hearing. This does not justify ignoring the mandates of the law, however. The law is that this case should be remanded to Commissioner for further proceedings, and it is this Court's duty to follow that requirement.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so she may consider Dr. Simmons' opinion in accord with the first remand order entered in this case and may give additional consideration to the what record reveals regarding the severity of Claimant's post-traumatic stress disorder.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above..

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report

and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: January 4, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE